Good afternoon, Your Honors, and may it please the Court. My name is Keith Donohue, and I'm here for Appellant Gloria Shavers. With me at the defense table are Paul Hetznecker, counsel for Jamel Lewis, and Karina Luguzzi, counsel for Andrew White. I'm going to be speaking for 15 minutes of the defendant's 20 minutes time, and I'd like to reserve three minutes for rebuttal, if I may. Okay. And Mr. Zalzmer, do you want to, I think you should probably respond and then have rebuttal, and then we'll go to the next five minutes. Does that make sense? No, whatever the Court prefers is fine. Yeah, I think that makes sense. We'll do your argument, Mr. Zalzmer, and your rebuttal, and then Mr. Hetznecker. All right? Very well, Your Honor, thank you. If I may, although I have a good deal to say about the interstate commerce issues, I'd like to turn first to what I submit may be the most striking aspect of this record, and that's witness Sharonda Gaskin's testimony that she feared for her life because, and I quote, for a fact I know that G-Bucks is a killer. Now, G-Bucks is a nickname by which the jury had come to know my client, Gloria Shavers, and I think it's worth pausing over the substance of this extraordinary testimony. This was a witness stating that she feared the defendant would kill her for testifying. When a jury hears something like that, there needs to be a mistrial, and both this Court and the Supreme Court have made clear that there are instances when a witness can say something so outrageous that no curative instruction can suffice to cure the prejudice. Although, isn't this the type of case where we really should let the district court assess the impact as compared to the evidence, the other evidence that's presented, the fact that it was one remark, not repeated, not referred to, the fact that there was an instruction given. You know, we don't know the credibility of this witness. Perhaps the district court should be in a better position to say, you know, she seemed like she was acting out the whole time she was testifying, and this was just another – I mean, district court didn't say that, but isn't this the type of case where we should let the district court decide and really be careful about abuse of discretion? Well, the most substantive comment that the district court made about what happened was that the prejudice was significant, and the district court lamented that Ms. Gaskin didn't simply say she'd heard he killed someone. The district court paused to say, she testified, I know he murdered someone. So that's most of what we have the district court saying. Now, I think in the typical case, some deference to the district court's rulings on mistrial motions is certainly due. But unfortunately, district courts can get it wrong. District courts may have an interest in moving a trial along. We do have a three-factor test that takes account of the matters Your Honor has identified. So while it was one remark, I think that it was a very persistent and pronounced remark. The third factor of that Lohr test is curative instruction. You had two, right? I mean, you had a curative instruction immediately, and then one right before the case went to the jury, right? There was a generic curative instruction when the case went to the jury about not considering argument or stricken testimony, and one very specific instruction about this one. The specific instruction came about 75 minutes after the testimony was given. The jury had actually been sent into recess and had lunch in the meantime. So that's a problem. That was, to me, a little curious. Does that help or hurt you? That helps me a great deal. How does that help you? Well, those 75 minutes that the jury was sitting there without having been admonished at all let this really become etched in granite in their minds. That's a metaphor used in the United States v. Hakeem case. It just sat there. And if you look very closely at the record, you'll notice that during that 75 minutes they went to lunch, they dispersed, they had been instructed, don't talk about the case, don't talk to anyone. Doesn't that really hurt your argument per se? I don't think so. I think the predominant significance of the delay is that it let that testimony sink into their heads and become harder to remove. Isn't your real problem our standard of review on this issue? I mean, it's the abuse of discretion standard. You're asking us to find that no reasonable person could have come to the same conclusion that the district court did. Isn't that a very heavy burden under these facts, under this applicable law? I think it is a heavy burden that these facts satisfy, Your Honor. I mean, if you look at the United States v. Gray case, the court in that en banc decision was also aware of the deference it owed the district court. There was, in that case, the prosecutor had stated to the witness, you killed your wife, right? It wasn't even testimony from the witness. It was a statement by the prosecutor. Well, it was also a statement by the prosecutor, too. And wasn't that part of it that the prosecution went far afield? But here, the prosecution only asked, what do you mean? And it seems to me, if they said, what do you mean, it could have bolstered her credibility because she said, you know, it's dangerous for me to be testifying here. In my neighborhood, people don't snitch. And that, you know, I could see here the prosecutor didn't really do something untoward. Doesn't that hurt you? Certainly not as untoward as in Gray. I don't mean to insinuate that at all. You stated in your brief, you thought that the prosecutor did bait her. How do you come across that? How do you come to that conclusion? That was just reciting the district court's chastisement of the prosecutor for having asked an open-ended question. You'll find the judge chastising the prosecutor very severely in the record and telling her shortly before the jurors come back in that this case is tossed if something like this happens again. Again, you've got these statements by the district court that show it's disturbed. The district court's disturbed. It's so disturbed, it tells the jurors, you can't even talk about this. Well, I don't question at all the zealous effort of the district judge to cure the matter. But unfortunately, it was a task beyond his ability to achieve. The very notion, don't talk about this, is somewhat telling. It calls to mind an idiom the court used several years ago in United States v. Lee, where the court said, we won't blindly assume that jurors turn a blind eye to the elephant in the deliberations room. I can't emphasize enough how unique I feel this statement is. I think this statement is eons more prejudicial than the statement in Gray or Carney. A witness testifying, she fears for her life because the defendant is going to kill her. No matter how conscientious a juror may be, that is going to ring in their ears inevitably. Well, it's interesting. I think that when we think of prejudice, we don't think of harmful. We think of prejudice meaning the emotion outweighs the evidence. Here, you had evidence of guilt, and that's one of the tests. But would you address the witness tampering? Because there, it occurred to me, if we look at the statement and we look at the witness tampering, I think that's a close case in terms of the actual guilt. And so the fact that maybe that evidence swayed in terms of witness tampering, I don't know. But isn't one of the tests that the weight of the evidence, I mean, the amount of evidence, and don't we have a situation here that really isn't that close? One of the tests certainly is the weight of the evidence. I do think the evidence here is weak, all right? There is a lot of testimony of a vicious episode inside a home. What there is virtually no evidence of is how a theft of $100 from a few people at a dining room table could ever have an effect on interstate commerce. That's an element of the charge that was brought here. The defendants were charged not with robbery, but with interfering with interstate commerce by robbery. And when it comes to that element, the evidence was, at least it meant non-existent. At the very least, it was weak. And as Your Honor says- Wasn't the jury instructed that a minimal or potential, what was the instruction under the Hobbs Act? It was along the lines of the United States v. Urban standard of minimal. Your Honor, we don't think there was proof here of a minimal effect on interstate commerce. I mean, it's an unusual case. The government talked about a robbery of a few people at a dining room table. Robbers took some money, took some cell phones, ordered everyone down into the basement, and then started rummaging around upstairs. But it's clear that the reason the robbers went to that house was because there was a speakeasy and they thought there'd be a lot of money there. So they were there targeting a business. And haven't we, in our case law, talked about the fact that they've targeted interstate commerce, that that has the potential effect, that that can be sufficient? I think that it would be a factor for the court's consideration if the robbery had been directed at the speakeasy. And Your Honor, respectfully, the evidence cannot support a conclusion that the defendants targeted the speakeasy. It absolutely cannot. They took everybody downstairs after the- They sent everyone downstairs so that people would be out of their way so they could rummage around the first floor for drugs. The evidence is fairly un-differentiated in that regard. The speakeasy was downstairs. That's right. Okay. So, Your Honor, in fact, at sentencing, the prosecutor stated that apparently this house was robbed on some supposition that there were drugs there. Well, that may be. There was evidence that the defendants rummaged through refrigerators and an expert testified that PCP is stored in refrigerators. And there was also testimony that the defendants kept yelling out, where's the wet? And there was expert testimony that wet is a slang term for PCP. So if the government had tried the case on the premise that this was a robbery affecting interstate commerce because it was directed at a drug-dealing operation, Judge Rendell, I think we'd have a much different situation. They did not prove a robbery directed at the speakeasy. The robbery wasn't in the speakeasy, which was downstairs. It wasn't of the speakeasy. None of the speakeasy's proceeds were taken and it wasn't directed at the speakeasy. But to paraphrase the government's argument that I think they make, Mr. Osmer can speak for himself. They argue that the interstate commerce that was affected by the robbery was some liquor bottles that may have been taken in the course of the robbery and the fact that the woman who ran the speakeasy testified that she discontinued the operation of the speakeasy after this robbery. Now, are either one of those substantially enough interstate commerce to be affected? Well, I don't think you're going to be surprised if I say no. I don't believe they are for several reasons. First of all, in this case, because the robbery was of individuals in a home and not a robbery of the speakeasy for the reasons I've just stated, we don't think it's appropriate to even be looking at any theoretical effects there may have been on the alcohol sales. That's too attenuated. If this robbery had taken place outside a bar in Chestnut Hill and the bar got a bad reputation because of it and went out of business, that would not be a Hobbs Act robbery, not a street mugging in front of a bar that turned out to have consequences for the bar's business. Well, unless the person stopped, unless the person closed their shop. If they said, I don't need this aggravation, you know, I'm moving to Florida and they close up shop. Well, what I'm suggesting is I don't think it would be enough if the robbery was just a mugging of a pedestrian in front of the bar, even if it ended up having an effect on the bar. And I think that analogy is the same here. It doesn't matter what happened to Jeanette Ketchmore's sales of alcohol because this was a robbery of her business. So you're saying it didn't affect. Well, Your Honor, I would also say that, or at least I would say that no rational trier of facts could find beyond a reasonable doubt either of the things you mentioned, either that her business went down or that bottles were stolen. I don't think those things could be found beyond a reasonable doubt. But more fundamentally, I think that they're irrelevant to the analysis because the robbery was not of the entity to which those things related. Um, you know, another analogy might be a robbery. I'm just looking at Walker. We've referred cases where it's targeted and there clearly was evidence here that business was targeted. They said because it had a lot of money and it was sweet, all the money is in the basement. They clearly were targeting the revenues of the speakees. I mean, there is evidence. Your Honor, I think it's the last sentence of what you said that's a step too far. There is testimony there about how they thought there would be money in the house. I'm willing to grant you that that would support an inference. They thought there was some kind of enterprise going on in the house. But all of the other evidence is that the enterprise they thought was generating the money was drug dealing. They were not concerned about the speakeasy. You won't find any statement of any defense. Does that help you or hurt you? Because they were targeting drug dealing as clearly interstate. It helps us because that was not a theory ever presented to the jury. There were no facts. It could be retried on that theory. There were no facts about drug dealing even in the record, are there, before the jury? Yeah, there are quite a few. I mean, there's quite an emphasis on the testimony of both Ricky Ketchmore and Jeanette Ketchmore that the men in the house were yelling, where's the wet? Where's the weed? And that they rummaged through refrigerators. Would we have to overturn precedent? I think you have a good point in that this is really far removed from interstate commerce. And yet we have language in U.S. v. Haywood. Any interference with or effect upon, whether slight, subtle, or even potential, we have that language in our case. Do we have to embank this? Because slight, subtle, or potential, maybe that's fulfilled here, but maybe it shouldn't be. I don't think you have to embank it. I mean, yes, there's that language. I mean, it is slight. It is subtle. If any, any of that. Or potential. Your Honor, I think as a matter of law, it's just— Is the bar so low that anything can meet it? Well, I think we're heading in that direction, you know. I mean, look, any robbery involves a theft of currency, which is, of course, the medium of interstate commerce, right? So theoretically, every robbery affects interstate commerce. Some kind of line has to be drawn. And traditionally, the line has been between robberies of individuals and robberies of businesses. Now, didn't the Sixth Circuit draw a line in U.S. v. Wang in 2000? And didn't our Walker, our recent decision in Walker, sort of say that the Third Circuit was not going to adopt that line? I wouldn't read Walker as rejecting that line. I'd read Walker as distinguishing those cases. You would agree that Wang would be a good case for you if it was a Third Circuit decision? Absolutely. And I still think it's a good case for us. I don't think Walker completely disavowed Wang. Walker makes a point of saying the robbery we're looking at is different from, and I'm quoting, the home invasion robberies of the type at issue in Wang, or here. So we have a home slash business invasion here. That's a way of looking at it. Certainly, that's what we can argue about all day. I'm going to argue it wasn't a robbery of the business because it didn't enter the business. The robber's only interest in the basement was as a place to go stow away the people so they could search through elsewhere in the house. They were not robbing the speakeasy. Since it wasn't directed at the speakeasy, it's different from cases like Walker. Not only did the court expressly distinguish home invasion robberies, but it said what really made Walker easy is that it was a robbery of a drug dealer on the street selling drugs. That individual was engaged in interstate commerce at the time of the robbery. Are you going to address witness tampering? I am going to address it, Your Honor. You want me to move on? I don't know how much that matters in terms of the overall scheme of things, the sentencing or whatever. Well, it means about a year to our client's sentence. And I do think it... Not as good as a misdreav. But I actually think the issue is extraordinarily clear, Your Honor, really extraordinarily clear. And the reason I haven't come to it until now is I think the briefs lay it out fairly well. The United States v. Bell case says that it's not witness tampering if it's solely motivated by a state proceeding. And here, that is the only possible conclusion from the record. There was nothing contemplated or foreseeable from a federal standpoint. Nothing contemplated or foreseeable, plus the speaker is affirmatively stating, I'm talking about my preliminary in a municipal court, a state court proceeding. Thank you, Your Honors. Thank you. Mr. Zausman? Thank you, Your Honors. May I please the court? I'm Robert Zausman on behalf of the government. To be very frank, I agree with Judge Randall's observation, if it is an observation, that the witness tampering issues present a challenging issue in this case. And I want to make sure to spend time on that. And I respectfully disagree with my colleague with regard to the briefs, because we do have the Fowler case that was decided by the Supreme Court after the briefing was concluded in this case. So I want to make sure to leave some time to address that. Let me first, if I may, go through the couple issues that Mr. Donahue referred to that I, myself, do not find challenging. The first involves this unfortunate statement that Ms. Gaskin made during her testimony, in saying that she knows for a fact that Mr. Shavers is a killer. I mean, this wasn't, I know for a fact that he's committed crimes. This was that he's done something so egregious that nobody is going to want him on the street. Oh, absolutely. And Judge Joyner, very experienced district judge, assessed the situation and gave an emphatic instruction to the jury to disregard it, had them orally promised that they would not only not consider it, but never mention it and not discuss it. What's the effect of the time period? There was mention that it was 75 minutes later. I mean, they bring up a point. I mean, do the jurors let that sink in for a while? And what effect does that have? They did go to lunch, and they did disperse. There obviously was no discussion. Could they have thought about it individually? Of course. But then they come back, and they get this very clear instruction. My problem with the defense argument here, and I think members of this court have probably heard this rant from me before, is I'm critical of arguments that take a dim view of our jurors and treat jurors as anything other than what they are, which is very intelligent, qualified adult citizens. Well, but by the same token, if the judge does not say anything immediately, and I'll never forget my first trial, counsel tried to pull something, and the minute it was said, I said to that jury, you are not to pay any attention to that. That has no bearing whatsoever, da, da, da, da. And so, but if a judge doesn't do that right away, then what do they go out, and their eyes are bulging like, oh, my God, this poor woman thinks she's going to get killed. You know, what about us? Well, sure, that's preferable, but again, my suggestion is that when you have intelligent people who are loyal jurors, who are told emphatically by a judge, whether it's 75 minutes later or even a day later, ignore it, don't consider it, you may not discuss it, people follow judge's instructions. That's a holding of this court and the Supreme Court. And so, sure, it would have been preferable to say it immediately, but I don't think it's watered down in any way, and that we can assume that the jurors did not follow this instruction. The other thing to consider here is that, again, looking at the precedent of this court, it's one statement, it's isolated, it's never repeated, it's a case in which there's an overwhelming amount of evidence with regard to Mr. Shavers. But more importantly... What about in Carney and Gray? Weren't those single statements? Well, in Carney, for example, I believe it was the court held that the evidence in that case was not overwhelming. And there you had a much more specific allegation, and this is what I'm getting at in terms of Ms. Gaskin's credibility, you had a specific allegation that that defendant tried to murder me and my children. So you have a much more substantive allegation. Gray, for sure, you have prosecutorial misconduct, which is a whole different ball of wax, in which the prosecutor says, didn't you murder your wife? We don't have that here, but I want to highlight Gaskin's credibility. Again, the presumption here is that this jury of gullible people is sitting there, they hear one witness say, I know he's a killer. And at that moment, they lose all rationality, they go back in the jury room, and they're going to convict him of anything, whether he's innocent or not. Now, of course, this jury doesn't even convict Mr. Shavers of everything. He actually is acquitted of counts in addition to the counts of conviction. But with regard to Ms. Gaskin, she is impeached from one end of the courtroom to the other throughout this trial. And in fact, if you look at the closing arguments, page 1887 of the appendix, is Mr. Shavers' closing. His counsel says, this is a witness who lied, admitted she lied, lied on several occasions. And the next page says, with regard to Ms. Gaskin and others, who are these witnesses? They are criminals. They are drug dealers. They are drug users. They lie on the witness stand. That's who they are. So we're supposed to believe that this witness who did have the vulnerabilities that were identified there, that this witness says one thing about the killer, that the judge emphatically tells the jury to ignore it. And we're to believe that the jury has nevertheless lost all reason. We don't accept that based on the court's pressure. MS. GOTTLIEB What about the witness tampering conviction? Because quite frankly, Mr. Salzman, I can't find a way that that was – that there was an official proceeding, as we have construed official proceeding, that should have been in the contemplation – could have been in the contemplation at that time. And I just – I have great difficulty with the jury's finding guilt on that. I mean, the evidence was underwhelming, if not non-existent. MR. SALZMAN Let me address that. And this, as I said, is a little complex. So if you'd indulge me to go through this step by step. The most interesting thing at the outset is that this wasn't argued to the jury. Here – this is basically a sufficiency question. And here we have defense counsel saying there was insufficient evidence for this jury to find that it was a federal proceeding. They didn't even have the temerity to argue that to the jury at trial, which I think is relevant. They actually did argue federal jurisdiction with regard to the Hobbs Act, which is a separate issue. But here they did not think it was worthy enough to go to the 12 people, and then they come to this court and say there was no evidence whatsoever. That's point number one. But point number two, it's very important to walk through the law here. MR. GOTTLIEB I just want to stop you there. That doesn't stop them from coming and arguing. MR. SALZMAN Absolutely not. I'm just saying it reflects the strength of the argument. But of course, that's true. But in working through the law here, the government has to show that there was an official proceeding, that there was an effort to obstruct, and that there has to be a particular official proceeding. That's what Arthur Anderson says. But none of this has anything to do with the defendant's state of mind, because the statute explicitly says, first of all, that the official proceeding doesn't have to be pending at the time of the obstruction. And second of all says that there's no requirement with regard to intent with regard to the federal nature of the proceeding. So in other words, what the government has to show is that this obstruction was directed at a particular federal proceeding, but does not have to show that the defendant was aware of that, knew it, contemplated it, predicted it. MR. GOTTLIEB But there was no federal proceeding. MR. SALZMAN There wasn't. And again, there's the MR. GOTTLIEB But what was the federal proceeding? You have to have an underlying federal proceeding at least. MR. SALZMAN Right. The federal proceeding here is the MR. GOTTLIEB Is it the post office thing? MR. SALZMAN No, no, no, not at all. The federal proceeding that's in the future is the prosecution of this robbery. MR. GOTTLIEB But the evidence on the tapes was having to do with their hearing on the 19th or the 18th in the Philadelphia courts. There was no trying, no attempt to tamper with anything federal. MR. GOTTLIEB But there was no, and on top of what Judge Rondella said, there was no anticipation on the part of the federal government that there was even going to be a proceeding. MR. SALZMAN Well, there I just disagree, Your Honor. The evidence that was submitted was that with the, certainly the investigation began with the investigation of the postal robbery, but immediately was relevant to the investigation of this matter as well. The search was conducted of Ms. Gasthauser, Gisthauser, I overpronounce that, within about 10 days or 9 days after this robbery. And it was during that search that they found evidence in her house from these people of this robbery, of the speakeasy robbery. At the same time MR. GOTTLIEB But those were the cell phones. MR. SALZMAN That's right. MR. GOTTLIEB And they didn't learn about the cell phones until much later. MR. SALZMAN But at the same time, the same federal investigators then requested the phone calls in the prison and immediately heard all sorts of evidence of the speakeasy robbery. And this is where Fowler becomes important. What the Supreme Court in Fowler resolved is what does the link need to be, given that there doesn't have to be, again, any anticipation or knowledge by the defendant, but the government does have to show that there's a link to an official proceeding, even if the official proceeding isn't in existence yet. And what Fowler says is a reasonable likelihood. There have been different standards from different courts over the years, and the Supreme Court says you need to show that there was a reasonable likelihood that there would be a federal proceeding. And that's where this case lies. I would submit that given that these federal investigators were working this case, given what the jury knew, a jury reasonably could find a reasonable likelihood. Again, we're dealing with the sufficiency of the evidence standard here. Was there sufficient evidence that a reasonable jury could rely on? Now, interestingly, this jury was instructed to make a finding well beyond this reasonable likelihood standard. And that's probably why none of the defendants have argued any infirmity in the jury instructions. The jury instructions simply told the jury, and it's at page 2024, there has to be a federal proceeding and the proceeding has to be pending or likely to be instituted. So the judge was at likelihood. Now the Supreme Court tells us it's a reasonable likelihood, which the Supreme Court says in Fowler, is less than or beyond a reasonable doubt. Mr. Zizer, let's go to the interstate commerce question and the Hobbs Act violation. You know, if this seems to me that this event seems to me to be a rather run-of-the-mill state law robbery that took place. And if this robbery is covered by the Hobbs Act, what would not be covered? What kind of robbery would not be covered? Well, there are plenty of robberies that are not covered by the Hobbs Act. Tell me one. A stick-up robbery on the street. One person walks up to another, points a gun at him, and takes his money. How does that, I mean, if the person you stuck up on the street was a drug dealer, that would be covered under Walker? Correct. Seems to me that here, the only real difference was instead of being on the street, it's inside someone's home. Well, that's why I disagree. And I strongly disagree with the characterization of the evidence that we heard from my friend, Mr. Lonnie. Tell us how. Well, we heard a jury argument that really just omitted the key facts. What makes this, the Hobbs Act part, not difficult, I said that the witness tampering I acknowledge is we need to address based on totally different standards. But first of all, you have the robbery here of a business. The question is, again, sufficiency of the evidence. Is there evidence in the record on which a reasonable jury could rely? And what we have first and foremost. A business was not robbed. I disagree, Your Honor. How was a business robbed? Well, first of all, they even questioned whether it was a business. They described this as some kind of social dinner party. So we started. Well, there was evidence from which they could say it was a business. If I may, Jeanette Ketchmore is the owner of the Speak DC. She testifies, page 1156 of the record. Ms. Ketchmore, was there a time in the past that you operated a business at your house? Yes, I did. What kind of business did you operate? Well, I used to sell beer, alcoholic beverages. But she wasn't doing that when the robbery occurred. She was upstairs asleep. Well, let me get to that, Your Honor. When they come in the house, the evidence is from those women who heard the planning for this, that this fellow con who was in on the planning said, this place has a lot of money. The money's in the basement. Let's go rob it. Again, a jury can infer from that this is a robbery targeting the business, the Speak DC. And finally, and most importantly, the Ms. Ketchmore, going back to Jeanette Ketchmore, page 1167. She says that when she was brought downstairs, a robber took her to the basement and kept asking her, where's the money? Now, if that's not evidence that a jury can rely on to find that this is targeting the money of the Speak DC. And I don't know where our case law gets this targeting. I mean, the Second Circuit and Wilkerson talks about targeting. We talk about targeting. But the law is an effect on interstate commerce. I mean, you can say there's an individual walking down the street and you think he's a big money manager and he has diamonds on his person. And therefore, you want to rob him and he'll stop his diamond business. But you stop him and all he has is money. And turns out, maybe it's the wrong person or maybe it's the right person, but it doesn't have any effect on interstate commerce. The fact that they've targeted something that could have an effect, we read that into the Commerce Closed Jurisprudence? Well, yes, this court has. Has the Supreme Court said that? Which case? Well, Urban, Whitmer. No, no, no, Urban's a different case. Well, it is a different, they're all different cases, but what the cases have uniformly said, and there are at least ten cases. Can you point out one where we said that a robbery of a home that also may have served as a speakeasy could constitute interstate commerce? No, I cannot identify a prior speakeasy case. There's not any even across the country. Your Honor, but what I can say is that this court has very clearly said, and I, you know, reasonable Americans can debate whether this is an appropriate division of federal and state authority, but what this court has said is that this is the maximum exercise of Congress's power under the Commerce Act. That any robbery or extortion that has even a potential effect on interstate commerce is sufficient to bring it within the scope of the Hobbs Act. Mr. Zosma, just stop me here. I want to stop you just right there. Tell me what the interstate commerce is. The interstate commerce is essentially running a bar. It's just an illegal bar. It's an unlicensed bar. That's why this case, Your Honor, does not strike me as that difficult. What effect does it have on the bar? Well, it closed down is the easiest answer. There's no evidence in the record that money or property was taken from Catchmore, right? The actual owners of the bar. That's, that's correct. The, but again, in terms of the effect on the business. This is, the reason this isn't a difficult case I submit is that this is a robbery in the premises of the business. And then Ms. Catchmore is asked, this is page 1175. Did you continue to operate this business after this occurred? She said no. The question was at all, and she said no, I got scared then. You know, that was enough. Now again, this, maybe two parties could argue this evidence, but this is evidence that a reasonable jury can rely on. The fact that it's closed, Your Honor, that, which we don't think is totally clear in the record. But even if the bar is closed and the last customers are finishing their card game before heading out the door, that doesn't mean that this doesn't have an effect on interstate commerce. If you just take away the illegal nature of the business. If you have a restaurant that has stopped serving, and the last patrons are there, and the armed gunmen come through the door and terrorize everyone, to the point that the business closes. Obviously, that's an effect on interstate commerce. Mr. Zosmer, what if the record showed that they went there because they know there was a big card game going on, and there was a card game going on every so many nights, and that was one of the nights. Would that be sufficient? Probably not. It's a harder question. Why not? Why would the card game differ from the speakeas? Well, if the card game were one of the things that the speakeasy offered in order to entice customers. No, just the card game. This place was known to have a big card game every Wednesday night, and they knew there was a lot of money on the table in that card game, and that's why they went there. Did people come from all around to go to the card game? And they went there. I'd say the reason I would at least hesitate before approving that case is that we don't have a business engaged in interstate commerce, which is what the cases tend to focus on. How does that differ from a speakeasy? Because in a speakeasy, as I said, is a bar. Ms. Ketchmore is going to a supplier. She's buying beer and wine and cognac and other products sold in interstate commerce. She's bringing them back to her bar. She's selling them at a markup at $2 a beer, $4 a shot. She is a bar. What if Ms. Ketchmore was cutting the proceeds at the card game? The house got $10 a hand. Well, then if we're starting to turn the house into a casino, then yes. That's the point I'm getting at. Then yes. Then I would say that at some point we do get to a business that affects interstate commerce, because this would be an instance of a business that certainly, when aggregated, does affect interstate commerce. So really the question becomes, isn't it? I mean, the question for us to answer here is, does the Congress, under the Commerce Clause, have the ability to regulate speakeasies and card games? Well, I don't know as to card games, because we're not- We don't want to get into card games. Well, we didn't present this case that way. All right. Let me limit it to the first. Does the Congress have the power under the Commerce Clause to regulate the operation of a private home that is being used as a speakeasy? And my answer to that is yes.  And that is that this is a bar. This is an establishment serving alcoholic beverages. If you look at the- The booze comes from out of state, and what else? You were saying, how is there a nexus? Well, that was the nexus we showed, just like in Hayward. And it's the exact same thing. If you look at the testimony of the customers, that's sort of interesting. They weren't going the way the Defense Council wanted them to go, in saying that this was some kind of social gathering, sort of dinner at eight, in which people happened to pay a couple dollars for their alcohol. When Alberto Vasquez was one of the customers, and he was asked, what is this? It's page 961. He says, the place people would go after the time inside the bars that closed at 2 o'clock. It's known on the streets as a speakeasy. It's a business. Same thing with Bryan Anderson, page 871. It was set up like a bar. 899, he says, when I got there, I saw it was a speakeasy. This is a known business establishment in the city of Philadelphia. The only thing different about it from the bar down the street is it's illegal. And it's serving a market of people who want to continue to enjoy alcoholic beverages after 2 in the morning when the bars close. So that's why I suggest this is not the challenging Wang and cases like that, which do take us to that outer edge. We're not there. Does the fact that the evidence of interstate commerce is a close question, does that impact on the Gaskins? Does the Gaskins statement have an impact on that question as to the weight of the evidence of that particular facet of the Hobbs Act? Theoretically, it could. But again, I don't think the Gaskins statement, being a single isolated statement, really even needs to concern us about the evidence. But with regard to the Hobbs Act robbery, Your Honor, with respect, I don't believe it's a close question. When you have a witness testify, I operated a business. I agree with you on the robbery part. So the witness standpoint? My point was directed more to the second or third element of the Hobbs Act violation here, that it had to affect interstate commerce. Right. And that's what I'm trying to answer as well, Your Honor. I don't believe that that element is a close question. Okay. Under the sufficiency standard or even under what's before the jury, when they hear the owner of the business say, I ran a business. I profited from the business. That's something I haven't mentioned. She says she took some of the proceeds to pay for her children's education. So she's selling it a profit. And I shut down the business as a result of this. This isn't one of those tough cases. I fully acknowledge, I respect what Judge Pollack wrote in the Walker case that we take very seriously about the need for federal prosecutors to be careful in what cases they prosecute, given the expanse of the Hobbs Act. We recognize all of that. What I respectfully suggest is this isn't a tough one. This is a business. And the only difference is it doesn't have a license. If you didn't have that statement from her that she shut down, if she had continued to operate it, would you have the same? Well, we suggested other things with my limited time. I want to focus on that. But certainly the jury could infer that all those dollar bills, dozens of them that were on the robbers when they were caught within minutes, were proceeds of the business. And that would satisfy Hayward. The two bottles that moved from the basement to the first floor when they were seen by Ricky Katchmore, that could satisfy Hayward. But this is a much stronger case than Hayward. And that's why I prefer to focus on the fact that the business closed. All right. Thank you. Thank you very much. Thank you, Your Honors. I'd just like to highlight, first of all, that Mr. Zausmer agreed that no during this robbery. And I think that's a very important fact. And Judge Rendell, that's at the heart of how we're dealing with that de minimis language. In all of our cases, Urban and the many important authorities before it, the fact is that the robbery was of a business. So we know that when there's a robbery of a business, a de minimis impact is enough. This Court has never, to my knowledge, in a precedential decision, upheld a HUBS Act prosecution where the robbery was of an individual. The plumbers may have been individual contractors in Urban, but they were robbed in their capacity as a sole proprietor of a plumbing business. I don't think there's a precedent from this Court holding that. And the cases we've cited in our brief, from Wang to Parada to Madison, all show robberies of individuals where those individuals have a much closer connection to commerce than do Alberto Vazquez and Brian Anderson and the other people who say they had money stolen from them. So you're saying if someone is in, let's say someone is in a store, and a shopper, and someone comes in and robs them, and then the store owner decides to curtail their business hours, because that's really what happened here. And individuals were robbed, and then the store owner, who was not robbed, basically, decides to curtail the business, that, that's like another leap, if you will. Because this is essentially a robbery of an individual. What about the fact that the business was clearly the target? But Your Honor, I disagree with you. I don't think the evidence can even be found to show that the speakeasy was the target. I think the evidence is beyond dispute that if there was an enterprise that was a target, it was a PCP dealing operation that was separate and apart from the speakeasy. Now, I'd like to refer, you know, the government has gone from one theory to another. Several weeks before trial, they filed a second superseding indictment to try to prosecute on the theory that the defendants attempted to rob controlled substances, and therefore, it was a Hobbs Act robbery. Judge Joyner precluded evidence on that theory due to a discovery violation. So that theory did not go to the jury. It would presumably be open to the prosecution on remand. We never heard from the prosecution, the district court, that, that the defendants stole bottles. This is idea. This is at one point where somebody's seen holding bottles. That was never argued to the jury. It's something that's come up on appeal. Now that the government has realized their evidence was not strong at all. Well, it was testified to, right? That there was testimony simply that at one point from Ricky Ketchmore, he saw one of the men holding two bottles. But there's no evidence that the bottles were actually taken out, I guess. Or moved anywhere. Does the speakeasy have to be the target to affect interstate commerce? Well, it did on the theory the government tried this case on. Yeah, I know that. But does it have to have been the target? Even if we find that it wasn't the target. If it affected interstate commerce, isn't that enough? Because it's, it's robbery. What's being penalized here is the robbery. Right. Well, that's just it, Your Honor. Every robbery in some abstract sense affects interstate commerce. Well, that's what some of our cases get very close to saying. Well, I think ultimately, and Walker included, which is a very thoughtful decision. The court's been very sensitive that there has to be some kind of line. It is pretty far out there. But there is a line. And the best proxy for it is whether the robbery is of an individual. So I think that, you know, where you haven't as attenuated a relationship with the speakeasy as here, no. It doesn't matter if the speakeasy was targeted. Judge Rondella, so I just was, I think you're right. That the jurors would have perhaps been frightened for their own safety on hearing this remark from a witness. And it's just, I know Mr. Zausmer doesn't like people insulting jurors' intelligence. But frankly, I think that very upstanding citizens, very intelligent citizens would have a very hard time putting this out of their heads. Thank you, Your Honor. Thank you. Thank you, Constance. Mr. Hitznecker? Good afternoon. If it may please the court, I don't know whether- I think you were before me when I was a district court judge. I was. Long ago. And cases like this bring back those thoughts. Well, this particular case is fraught with a number of problems, both pre-trial and of course during trial. And I know that this court has discussed at great length the Hobbs Act issue. I want to dovetail that issue with the 404B and 403 evidence that was admitted at the time of trial of the postal robbery. Underlying this entire investigation was this notion that somehow a group of individuals at Ebony Gist's house were also involved in this postal robbery. Not one shred of evidence connected my client nor the co-defendants to this postal robbery, but there was a tremendous amount of innuendo, including the direct evidence that, in fact, the prejudicial- overwhelmingly prejudicial evidence admitted by the testimony of Kathleen Grady, who testified as the postal inspector, that in fact they secured a search warrant for that house, and that in doing so they did it based on information that they had received. Now, the government argues in its appeal, in its response to my brief, that in fact, well, this evidence demonstrated a federal interest in the underlying investigation. And that's where I'm concerned. We have a case that is by razor-thin edge on the Hobbs Act issue, presented- the same jury presented with this backdrop, this underlying notion that there is a postal robbery looming out there somehow connecting our clients to this, when there's not one shred of evidence of that. And in fact, even if that had been the motivation for the underlying federal investigation, that evidence certainly should never have been admitted at trial. There was a motion in limine to exclude that evidence. The government sought to introduce it. The government, in its brief- and by the way, if I could reserve just a moment of time to respond to the government on this. But the government argues in its brief that, well, it's not really 404B, because we never really connected it to any of the named defendants, so there really aren't uncharged crimes. The problem is it doesn't escape the 403 analysis here. The 403 analysis is significant, because you've got an underlying case of allegedly a postal robbery, not connected in any clear evidentiary way, but a clear inference drawn by the jury that the same group of individuals where there had been a discussion about post-incident with my client, Jermell Lewis, about what had occurred that night intertwined with this postal robbery. What specific evidence was objected to before the district court? It was objected, I think, throughout. We had a motion in limine it was objected pre-trial, and it was objected, I believe, at the time of trial. The government argues that you're evaluating it on plain error. But even on the plain error analysis, this is clearly beyond the realm of what I believe to be the court's gatekeeping function on the issue of 403. And the reason why I think it's important in this particular case is because, as I stated before, the evidence on the Hobbs Act was so minimal and so tenuous, and I agree with my co-counsel that, in fact, a line of demarcation should be drawn in this case. This is precisely the case to draw and limit the scope and the extent of federal power under the Commerce Clause. So you're saying to hear about something else that has to do with federal government, federal, so they put two and two together? Absolutely. I agree that when Mr. Zosma says the juries are very intelligent, I absolutely agree with that. And I think that under the circumstances in this case, when you don't have strong federal evidence or federal connection in this case, and, in fact, you have the jury grappling with that, coming back with a question on federal jurisdiction, which is what they do while they're deliberating, when you have that in conjunction with this, what I believe to be clearly unduly prejudicial information about the backdrop of a postal investigation, it undermines my client. I'm sorry. Do you have a... I do have an issue, and I want to argue that. Brian Anderson, this is also a very important issue, and I want to respond to or anticipate the government's response on harmless error because I think it's not a harmless error issue. Here's the question with Brian Anderson. Brian Anderson makes no identification of my client. The incident occurs at night, as you've heard, and you've read the record. He has 20 seconds to have seen my client, allegedly, the witness, the person he allegedly identifies as my client, according to his testimony, but the assailant, 20 seconds to have viewed him. That's it. Three and a half years later, he's viewed, he's shown a photo array and does not make an identification. Now, this is squarely within United States versus Emanuel because in Emanuel, as the court remembers, there are two bank tellers outside the courtroom. The defendant is brought in shackles to the courtroom, no prior identification. In fact, same scenario. Neither witness identified in the post-incident confrontation, the photo array, the defendant in that case. However, there is a in-court identification following this out-of-court, unduly prejudicial, out-of-court identification, unduly suggested out-of-court identification with the defendant being brought in shackles. It's no different here. The government seems to argue in a very, first of all, it doesn't argue Emanuel with respect to my client at all. If you look at their response, they argue Emanuel with respect to the show-up issues raised by co-counsel on whether or not the show-up identification was legitimate. But when it comes to my argument on Brian Anderson, they don't argue Emanuel. In fact, they skirt the issue. Emanuel is directly on point. In this case, what we had was, we had a bifurcated motion to suppress. It began in December. It was bifurcated for scheduling reasons until June. We knew on that June date that that motion was not going to go forward. We knew that. Yet the government did not cancel the bring-down. They had brought in Mr. Anderson from out-of-state. He's brought to the FDC. He's been transported with the same group of inmates that include my client, who had never, ever been identified by Mr. Anderson before. So he's brought over. The testimony was, I become aware of this because I receive a 302 from the prosecutor indicating that, in fact, oh, by the way, he was seen in the marshal's holding cell, and he was standing and talking with the other two co-defendants who had been previously, Mr. White and Mr. Shavers, who had previously been identified on scene by this witness. The government says that was all inadvertent. Do you dispute that? Your Honor, actually, it doesn't matter because Emanuel doesn't say that the confrontation outside the courtroom was anything but inadvertent. The marshals brought Emanuel into the courtroom, and there was no evidence of a setup that the prosecution tried to arrange this post-incident out-of-court identification. So I don't think it's relevant here, and I think it's interesting that the government would add this bad faith kind of issue as if it somehow affects the court's decision on whether or not it's unduly prejudicial. It does not. This was a completely unduly suggestive post-incident identification three and a half years later after he'd all... I'm sorry, Judge. I'm sorry. Although if it's harmless, I mean, we do have evidence here. We have phone conversations with Lewis suggesting his participation. We have Ebony Gist and Sharonda Gaskin's testimony as to his statements. We have Sharonda Gaskin's testimony about the meeting where they all learned about the speakeasy and prepared to rob it. I mean, we have evidence here that he was involved. There is, and let me respond, and I respond to that precise argument in my brief. Your time's up. I'll give you 60 seconds to do that. In response? Yeah, give 60 seconds. Now, right now? Yeah. Very quickly. It's not harmless, Sarah. I agree with Mr. Zosmer that Ebony Gist was cross-examined at great length. She was not a credible witness. She admitted to perjury before the grand jury. That's number one. Sharonda Gaskin's was a jilted ex-girlfriend, essentially, or Sharonda Gaskin's was the one perjured. Ebony Gist was a jilted ex-girlfriend. So you had two witnesses that were undermined. Their credibility was undermined. Third, you have one witness, Alberto Vasquez, who identifies my client and is absolutely certain without any doubt in his mind that the birthmark on my client's face was the identifying feature, despite a generalized description, until cross-examination, when I established that, in fact, it wasn't in the photograph that he was shown in the photo array, and, in fact, it was a tattoo placed on my client's cheek years after the fact, two years after the fact. So when he makes an identification, it is not a reliable identification. He says it looks like, number one, the prime, Mr. Lewis, and it also looks like number four. So we have, right there, an instruction to the jury. What identification are you talking about right now? Photo array or something? Photo array, yeah. This is the second. This, Your Honor, this is the only other. Isn't that either unduly suggestive? Isn't that the first step we have to look at? I think if you look at the question of whether or not... I think you look at the question of Emmanuel, the photo arrays were both shown to the witnesses, initially, the bank tellers, and they didn't identify. It was a factor to consider. The suggestive nature of the out-of-court confrontation was the marshals bringing the defendant into the courtroom, and likewise here, my client being put in the cell room with the two co-defendants and the key witness standing next to them, being able to now put it together, oh, that must be the third individual. All right, we'll hear from you. Thanks very much. Well, briefly, excuse me, briefly, Your Honor, with regard to the postal robbery, we're in an interesting situation where we sort of can't win. We have to show under Fowler, as I said, that there was a reasonable likelihood of an official proceeding that was federal, whether the defendants were aware of it or not. And here we're told we can't tell anything to the jury about why the federal investigators were even there. That's the reason the evidence was admitted. It was carefully admitted and monitored by the district court so that it would not be prejudicial. There was never any suggestion made to the jury that these three gentlemen were involved in the postal robbery. Instead, Ms. Brady was the main investigator who testified that she was conducting an investigation of the postal robbery. It led her to do a search of this house. They found cell phones that belonged to vestments. Or witness tampering analysis. Exactly. But you didn't argue that it was the official proceeding in the witness tampering. No, we didn't. And we never, but we also never argued that these men had anything to do with the postal robbery. It was the essential background of how federal investigators got involved, leading virtually immediately to an investigation that touched on the speakeasy robbery as well. So if we're denied that evidence, there's really no way to prove the official proceeding element of the witness tampering charge. There was no prejudice to the defendants, though, because they weren't accused of anything involving the postal robbery in any evidence. With regard to the identification of Lewis, it's very important here, and I think I heard it a bit in the questions, to break down what the legal standards are here. The legal standard, there's a distinction, as I know your honors know well, between due process, which is the government's obligation to not do anything unfair toward the defendant, and the sufficiency of the evidence, the persuasiveness of the evidence. Putting in identification evidence by itself is not a due process issue. It's something that can readily be argued to a jury. What Mr. Lewis's complaint is here with regard to Mr. Anderson is how could he identify me? It was three and a half years later. I was standing there with shavers and white. That's something you readily can argue to the jury, and it's a proper issue for the jury. The question, though, under Emanuel, Biggers, all these other cases is, is did the government engage in any violation of the defendant's constitutional due process rights? That happens where the government engineers an unduly suggestive identification procedure. There was no identification procedure. This was inadvertent. They happened to be with a large group of inmates in the same place at the same time. Anderson saw what he saw. He reported it. It was told to the jury, and the jury could evaluate that. We don't get to the due process issue. The last thing, just a final word on the Hobbs Act, if I may. I don't think that what Mr. Hesnecker argued spills over to those Hobbs Act questions, which I think I did fully address. If I could just make one other point with regard to Mr. Donahue said. I don't agree that he said we conceded that no proceeds of the bar were taken. That's not accurate. We have argued it. It's in our brief. That wasn't the focus of my argument here, but certainly we think proceeds of the bar were taken, and more importantly, a reasonable jury could infer it from something like 60 or 70 $1 bills that were found on the two men immediately after they escaped from the robbery. Well, now, why would they be proceeds? These are customers at the bar. Customers don't get proceeds. Mrs. Whatever, upstairs asleep. She took the money upstairs and put it under the mattress and went to sleep. Aren't they the proceeds? Well, no, because here's where we get into the weeds of the evidence. Ms. Ketchmore testifies that she went to sleep around 3 a.m. and that she didn't believe that any further sales were going on, but if you read Vasquez's testimony, it's pretty clear that sales were still going on. Now, he... Why would the customers have money? Because there's this fellow named Daryl who is the bartender. He's the worker there, and he died, and he didn't testify, wasn't available to testify at the trial, but Daryl is the guy selling, and so what... But did he... Was his money taken? There's no evidence regarding that, but given that there is evidence that sales were continuing, I'm not saying it's conclusive, but I'm saying it's evidence a jury could rely on. They could rely... You made the dollar bill seem like what you'd have in a card game, not the proceeds of... Except for the fact that we did put in evidence regarding the prices of these drinks, $2 for a beer, $3... There's no evidence that any of those dollars were proceeds. Is there any evidence? It's an inference, Your Honor, and the jury... Are you trying to say this is change they got for buying the drinks? That's an inference also. The jury is entitled to make a reasonable inference. There can be conflicting inferences, and on appellate review, this court is required to accept the reasonable inferences that favor the verdict. Here, you could have an inference that Daryl has the proceeds of the bar. You could also have an inference... Or that there were proceeds downstairs. You could also have an inference that all these $1 bills were held by the customers. The jury is entitled to make the decision. Now, again, we don't rest on that because, and this is the last thing I'd like to say, we have to keep in mind also this court's repeated holding that the effect on commerce can be potential. Now, the reason for that holding, and the reason it's right, is that the statute itself prohibits attempt. And, in fact, attempt was charged in this indictment, not just the substance of robbery. So, an attempt to affect interstate commerce. This is why it also doesn't matter if the bar closed five minutes before. If there's a potential impact, that's sufficient. Maybe if a business is robbed, but if we were to conclude that individuals only were robbed here, I think it's very tough to say that the potential effect on interstate commerce. I agree. If this court's conclusion is that only the individuals were targeted and robbed, we'd probably lose this case. But there is evidence in the record that this was an ongoing regular business that was targeted, that they took Miss Ketchmore down to the basement asking where the money was. And that's why on appellate review, with all respect, we don't believe that would be an appropriate conclusion. Thank you very much, Your Honor. Thank you. Last word, Mr. Your Honor, I would actually see to my colleagues, since Mr. Zosmer spent most of his time in response to the Hobbs Act issue, I would then defer to Mr. Donahue if you would allow him to respond. Mr. Donahue, any last words to leave us with? It's an interesting and difficult and important case. Mr. Zosmer emphasizes that Jeanette Ketchmore may have been wrong about X or Y or Z, but she did state absolutely that she took the proceeds to bed and nobody else stated anything else to the effect that there were still proceeds out there. You could infer that she's not credible, but there's no affirmative evidence the proceeds were stolen. Fowler is a case certainly important to the witness tampering counts that Mr. Zosmer has been addressing, but I would submit, and this is laid out in our reply brief, that it's actually not directly applicable. There is a subjective element here, and that's that the defendant had to have in contemplation an official proceeding. Thank you. Thank you. Case is very well argued. We'll take it under advisement.